Filed 6/30/22  P.M. v. S.S. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| P.M., | D078381 |
| Respondent, | |
| v. | (Super. Ct. No. D564096) |
| S.S., | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Truc T. Do., Judge.  Affirmed.

S.S., in pro. per., for Appellant.

Crowell & Moring, Michael Yaghi, Michele Bongiovanni; Domestic Violence Legal Empowerment and Appeals Project and Sasha Drobnick as Amicus Curiae on behalf of Appellant.

P.M., in pro. per., for Respondent.

# I.

# INTRODUCTION

Appellant S.S. appeals from the trial court's denial of her petition for a domestic violence restraining order (DVRO) against respondent P.M. The history between S.S. and P.M. is lengthy and disputed. According to S.S., she filed the petition for a DVRO after the couple's daughter, N., disclosed to S.S. that P.M. had sexually abused her. S.S. also alleged that P.M. had engaged in other harassing or abusive behavior toward S.S.

After conducting a hearing that took place over multiple nonconsecutive days, the trial court determined that S.S. was not credible and concluded that S.S. had failed to meet her burden to establish by a preponderance of the evidence that the alleged abuse occurred.

On appeal, S.S. contends that in denying the petition for a DVRO, the trial court abused its discretion in various ways and failed to properly consider and address certain evidence of past abuse. She also contends that the trial court improperly relied on a debunked "pseudo-scientific theory" regarding parental alienation in determining that S.S.'s accusations regarding the sexual abuse of N. were not credible. We conclude that S.S. has not demonstrated that the court's findings are unsupported by substantial evidence, or that the court otherwise erred in denying her petition for a DVRO. We therefore affirm the order of the trial court.

# II.

# BACKGROUND

A. *General background regarding the parties' relationship*

S.S. met P.M. in mid-2002 in San Diego, a few months before S.S. was deployed overseas as a member of the U.S. Navy Medical Service Corps. The pair dated casually at that time. P.M., who is a citizen of India, moved back

to India between 2006 and 2008 due to visa issues. After P.M. returned to the United States, the parties again dated for a few months. The parties remained friends over a period of many years. However, they provided conflicting testimony as to their level of romantic involvement at various points in time. P.M. indicated that although the pair were friends upon his return to the United States, they "started getting back together" in 2009 and discussed having a child together. S.S. indicated that although she maintained a friendship with P.M. and that their relationship was intimate at times, in her view, "it wasn't a committed relationship."

S.S. testified that she became interested in having a child in approximately 2010. She joined a "Single Mothers By Choice" group, and "started to explore some . . . options" for having a baby on her own. P.M. testified that he and S.S. "tried" to have a child for approximately six to nine months. S.S. disputed this testimony and indicated that P.M. had agreed to be a sperm donor for her. It is undisputed that P.M. signed a Known Sperm Donor Agreement prior to S.S. giving birth.

After years of unsuccessful fertility treatments, S.S. decided to use an egg donor. She became pregnant and gave birth to N. in mid-2014. P.M. was not present in the operating room when N. was delivered by cesarean section, and he was not present when S.S. and N. were discharged from the hospital. S.S. did not include P.M.'s name on N.'s birth certificate at the hospital, consistent with the terms of the Known Sperm Donor Agreement.

B. *P.M.'s parentage action*

In November 2016, when N. was approximately two and a half years old, P.M. instituted an action seeking to establish his parentage and to be granted shared custody of N. The parties engaged in contentious litigation regarding these issues for almost two years, until December 2018, when they

entered into a stipulated judgment, pursuant to which P.M. was granted parental rights and a physical custody time share. In the months before the parentage proceedings concluded, N. variously referred to P.M. as "babysitter" and "dad"; according to S.S., S.S. referred to P.M. as a "babysitter" because, prior to entry of the judgment in the parentage action, P.M. was "just a sperm donor."

## C.  *S.S.'s request for a DVRO*

On June 21, 2019, S.S. moved ex parte for a DVRO against P.M. In a declaration attached to her request for the restraining order, S.S. alleged that the most recent incidents of abuse involved P.M. sexually abusing N. and P.M. telling N. that he was going to kill S.S. and S.S.'s mother. S.S. also included in her declaration descriptions of additional alleged instances of prior abuse.

### 1.  *The most recent abuse alleged in S.S.'s request for the DVRO*

S.S. alleged in her petition for a DVRO that in late May and early June, on two instances after N. had spent custodial time with P.M., N. returned home and told S.S. " 'don't go there, the babysitter said he was going to kill you and [N.'s grandmother].' "

S.S. further alleged in her request for the DVRO that after P.M.'s visitation with N. on June 18, 2019, while S.S. was helping N. to get dressed after a bath, N. said, " 'You know what momma, the babysitter showed me his booty,' " as N. pointed to her backside. According to S.S., N. then said, " 'he also showed me his' and pointed to her vagina." S.S. also recounted that N. said that P.M. " '[t]ook off all his clothes, even his panties,' " and that when S.S. asked N., " 'What did he do' . . . she said, 'private parts mom, private parts.' " S.S. stated that N. indicated that P.M. "kept trying to take her panties off." When S.S. asked "if she let him," N. said, " 'No I ran and hit him

4

with a straw, and I transformed.' " According to S.S., N. repeated that P.M. took off his clothes and tried to show N. his private parts. When S.S. asked N. what she did when that happened, N. responded, " 'I was hiding, and he followed me and kept trying to show me. He tried to take off my panties too.' " N. also said, " 'He showed me his big eyes and I was scared. Mom, can you find me another babysitter? I don't want to go there.' " When S.S. asked whether this conduct had occurred only this time, N. responded, " 'it happens all the time.' " S.S. stated that she asked N. what happens when P.M. takes off his clothes, and N. took S.S.'s hand and started rubbing it over N.'s genitals.

2. *The prior abuse allegations included in S.S.'s declaration*

Under the heading "HISTORY OF ABUSE" (boldface and underlining omitted), S.S. described four other incidents, in chronological order, that she believed constituted prior abusive conduct. S.S. stated that in 2014, just after N. was born, in the visitors lobby of the hospital, P.M. became "furious" when he learned that he was not named on N.'s birth certificate.[1] S.S. stated that she had given P.M. the keys to her car to retrieve something from the car, and that he "ended up taking off with my car keys" and failed to return them for more than a month.

S.S. next described that in May 2016, S.S., N., and N.'s grandmother (S.S.'s mother), traveled to India. After several months, S.S. returned to the United States, but N. remained in India with her grandmother. In December 2016, P.M. traveled to India without S.S.'s knowledge. S.S. alleged that while P.M. was in India, he "hired people to call and harass my mom, and to threaten her to bring [N.] outside the house" by saying "that if she didn't

---

[1] According to S.S., P.M. yelled "things like, 'You're just a woman! You're beneath me! I could kill you right now! How dare you do that.' "

come out . . . things wouldn't be good for her." At that time, P.M. did not have any visitation or custody rights with respect to N.; according to S.S., P.M. moved ex parte for an order requiring S.S. to return N. to the United States, but his motion was denied.

S.S. also alleged that in November or December 2016, and again in June 2017, P.M. trespassed on the property at her condominium complex and was asked to leave by the concierge because S.S. had asked personnel at the complex "to not let him in."

The final incident that S.S. described in her declaration occurred on December 5, 2018—the day the parties signed the stipulated parentage and custody agreement. S.S. heard P.M. saying things about her to his attorney, such as, " 'This bitch, how can she do that . . . . I'm going to show her what I could do. I'm going to drag this case out. I can show her even now what I can do."

D. *The proceedings on S.S.'s request for a DVRO*

The trial court held a contested hearing over multiple days: October 8, 2019, December 18, 2019, and June 30, 2020.

The trial court heard testimony from eight witnesses, including P.M. and S.S. We briefly summarize the witnesses' relevant testimony as follows:

1. *Detective Joseph Bianco*

Detective Joseph Bianco had worked as a detective for one year in the Child Abuse Unit of the San Diego Police Department. In June 2019, Detective Bianco was assigned to investigate the initial allegations of P.M.'s sexual abuse of N. Bianco testified that he usually closes a case if there is no disclosure by the child during a forensic interview. N. did not disclose any abusive conduct during her initial forensic interview at the Chadwick Center, which Detective Bianco observed from another room. Detective Bianco

6

therefore closed the case and informed S.S. that the case could be reopened if N. made subsequent disclosures.

## 2. *Detective Daniel Plein*

In mid-July 2019, Daniel Plein, a detective in the Domestic Violence Unit of the SDPD, was assigned to investigate S.S.'s allegation that P.M. had violated the terms of the temporary restraining order that was issued on June 21, 2019. Specifically, Plein investigated an incident in which an envelope containing a photo of P.M. was mailed to S.S. The photo of P.M. had the words " 'Fuck you' " written across the top and " '[S.S.,]' 'stupid bitch' [ . . . ]" written at the bottom. Plein acknowledged that "there's no way for [him] to ascertain where this package came from." The investigation into the incident was considered closed.

## 3. *Nancy Quinteros*

Nancy Quinteros is employed by Child Welfare Services (CWS) at the Department of the County of San Diego Health and Human Services Agency as a protective services worker. In that role, Quinteros investigates allegations of child sex abuse. She was referred N.'s case in September 2019.

Quinteros interviewed N., S.S., and P.M. separately regarding S.S.'s allegations of sexual abuse. CWS closed the case, determining that the investigation of the allegation of sexual abuse was "INCONCLUSIVE as defined by Penal Code 11165.12(c)."[2]

---

2    Penal Code section 11165.12, subdivision (c) defines an " 'Inconclusive report' " as one "that is determined by the investigator who conducted the investigation not to be unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect, as defined in Section 11165.6, has occurred." An " 'Unfounded report' " is one "that is determined by the investigator who conducted the investigation to be false, to be inherently improbable, to involve an accidental injury, or not to

7

The court limited Quinteros's testimony regarding the statements that N. had made to her, pursuant to a hearsay objection. The court also limited Quinteros's testimony with respect to a "three-houses drawing" that N. had been asked to make during her CWS interview, concluding that "the drawings speak for themselves."

4. *Detective Bob Johnson*

In August 2019, Bob Johnson, a detective in the Child Abuse Unit of the San Diego Police Department, managed the investigation into claims of sexual abuse of N. after the investigation was reopened. On August 29, 2019, Detective Johnson interviewed S.S., who informed him that in the time since the initial investigation had been conducted and closed, N. had disclosed acts of sexual abuse to her pediatrician and to a child therapist whom S.S. had retained to provide therapy for N.

After Detective Johnson spoke with S.S., he joined Quinteros in observing the second forensic interview of N. conducted by a social worker at the Chadwick Center "who is trained to conduct forensic interviews with children."

Detective Johnson testified that N. did not disclose sexual abuse during this interview. On cross-examination, Detective Johnson was asked whether he was aware that N. had made a disclosure of abuse to "the social worker," and he conceded that such a disclosure had been made.[3] However, in his opinion, the "disclosure" was not believable, in part because of the way that N. behaved during the forensic interview, and in part because of the things

constitute child abuse or neglect, as defined in Section 11165.6." (Pen. Code, § 11165.12, subd. (a).)

[3] It is not clear from the record to whom Detective Johnson is referring when he stated that he understood that N. had made a disclosure to "the social worker."

that she said, such as that "her dad held her down and peed and pooped in her face, and then she flies out the window." Detective Johnson stated that he did not "believe something of that nature" had actually occurred.

Detective Johnson conceded that he had not reviewed any notes prepared by N.'s pediatrician or by her therapist.

Detective Johnson closed the investigation after the conclusion of the second forensic interview.

5. *Dr. Jennifer Davis*

Dr. Jennifer Davis has a private medical practice in San Diego and has been board certified in child abuse pediatrics/forensic pediatrics since 2008. S.S. called Dr. Davis to testify as an expert witness.

Prior to going into private practice, Dr. Davis conducted child abuse evaluations at the Chadwick Center, where she worked as a fellow and eventually as medical director. In her role there, Dr. Davis conducted and observed thousands of videotaped forensic interviews of suspected sexual abuse victims.

Dr. Davis testified about the importance of the manner in which forensic interviews are conducted, given that in most cases, the only evidence of the abuse is a child's disclosure. She also stated that trained professionals consider whether children who are suspected victims display behavioral symptoms, such as being aggressive, biting other children, having tantrums, or appearing afraid and clingy.

S.S. contacted Dr. Davis to conduct an examination of N. The examination took place on August 1, 2019. When asked about the purpose of the examination, Dr. Davis stated that she examined N. to provide a medical diagnosis regarding abuse and "engage in a treatment plan for the child." Dr. Davis expressed concern that employees at the Chadwick Center had not

9

initially followed the proper protocols with respect to N. because she had never "been offered an exam at the Chadwick [C]enter," which, according to Dr. Davis, was "standard practice" when Dr. Davis worked there. She also expressed concern that an "extended forensic interview, meaning you could come back multiple times so that you were comfortable in the environment, comfortable with the social worker" had not been "offered" to N., "to [Dr. Davis's] knowledge."

Dr. Davis described her own approach to examining a child for potential sexual abuse, which she used in examining N. Dr. Davis testified that S.S. was present during the entire examination. Dr. Davis asked N. about P.M., and she testified about N.'s response, both verbal and behavioral, as well as her observations regarding those responses:

> "THE WITNESS: Okay. So I asked N., 'Do you want to go back to the baby-sitter?' She had been kind of bouncing around the room and playing, and her [a]ffect changed very suddenly, her face dropped, she stopped playing, she stopped talking, became very shy, and stood behind her mom, who was sitting in a chair, and then she just blurted out, 'But the baby-sitter' - -
>
> "[¶] . . . [¶]
>
> "A.      So N. blurted out, 'But the baby-sitter did not actually touch my private part. He was bouncing on pillows and tried to take my panties off. He tried to do that, but he could not reach me. I went way up high on a shelf, and he did not touch my private part. He just gave up and nothing else. And that's when I went home with mama. I don't want to go to the baby-sitter anymore. I'll get a new baby-sitter. It has to be a girl.'
>
> "Q.      Was anything you observed in N. significant to you?

"A.      The change in her [a]ffect when I said, 'Do you want to go back to the baby-sitter?' She went from a happy, bopping around five-year-old playing games, talking about unicorns to standing behind her mom and kind of glaring at me with a very serious expression.

"Q.      Why was that significant?

"A.      It - - obviously, she did not really want to talk about that. I think prior to me making that statement, she thought she was kind of in for a regular checkup because we hadn't mentioned anything, other than I was going to check up on her health. I think she was a little bit surprised and not happy to be discussing that.

"[¶] . . . [¶]

"THE COURT: And for this part of the interview, the mother was in the room with her?

"THE WITNESS:    Correct.

"[¶] . . . [¶]

"Q.      Did [S.S.] say anything to you after [N.] made that disclosure?

"A.      No. We had already discussed, prior to going into the room, that we were just going to tell [N.] it was okay to talk to us and neither of us was going to really respond in any way, because we didn't want to change the way [N.] was telling her story or make her feel guilty or ashamed or that we were surprised, so no. She - - the mother's eyes were still on me, and N. was still standing behind her. [¶] And I just said, 'Well, thank you for telling me that, and you're a healthy girl.' And we went outside and got toys out of the toy chest that we have."

When asked whether she found anything about N.'s statement "significant," Dr. Davis responded:

"Yes. I thought they were very significant, because all I said is, 'Do you want to go back to the baby-sitter,' and she immediately launched into private parts and panties, and it's common for young children to kind of make fantastic disclosures, like, 'I got up on a shelf,' you know, 'I'm a hero,' so I didn't lead her in any way to think that we were talking about panties and private parts and such.

"I just said, 'Do you want to go back to the baby-sitter?' So the absolute change in her demeanor and her statements were very concerning to me."

When Dr. Davis was asked what she concluded after examining N., she responded, "Well, I entered only one diagnosis, and that is the billing code that was also sent to TRI-CARE: Suspected victim of child sexual abuse." Dr. Davis testified that because she later became aware that Aimee Clark, a marriage and family therapist who S.S. had retained to assess N. for child abuse, was going to report the same finding of abuse, Dr. Davis agreed to let Ms. Clark file the form for making a mandatory report of suspected child abuse.

Dr. Davis conceded that she had not watched any of the videos of forensic interviews of N. that were conducted at the Chadwick Center. Dr. Davis's understanding, however, was that N. had not made any sexual abuse disclosure during the first forensic interview. Dr. Davis also acknowledged that she was aware that N. had not made a disclosure when someone from Child Welfare Services spoke with her.

Dr. Davis conceded that she examined N. only a single time, on August 1, 2019. Dr. Davis also conceded that she does not "know whether or not there was any kind of abuse in this case, personally," and that she "never do[es]."

12

6. *Aimee Clark*

S.S. took N. to see Clark, a marriage and family therapist, in August 2019. Clark usually utilizes "nondirective-play therapy" when working with children. However, while Clark typically allows children to guide the therapy, Clark did have "a specific agenda" for the "very first session, because [she] was assessing for abuse." By the time Clark testified in this case, she had seen N. for 11 therapy sessions.

Clark testified that during each session with N., she checks in to see how N. is feeling about significant people in her life. Clark shows N. a "feelings chart" and asks N. to put letters representing people in her life next to the feelings on the chart. Clark noted that "[t]he one thing that's consistent every single time is she is angry with her father. She puts him next to angry. One time she did put worried, and it stood out to me because almost always it's angry." According to Clark, when she inquired with N. about why she is feeling happy or sad, and when asked about her father, N. would say "that he's mean."

Clark also testified about a "stick figure" "chart," which she described as a "cartoon figure of a child," that she and others in her practice use with children to discuss how they feel in different parts of their bodies. She described "teach[ing] a child the wave of yuck, so they understand what that feeling is, that wave that comes through their body." N. indicated that her father "brought up yuck."[4]

Clark indicated that N. had been aware of the "purpose of meeting" Clark when she came to her first session. Clark testified that "[s]he knew she was there because the babysitter, which -- or her father was -- has been being

---

[4] The "charts" from N.'s sessions, which included Clark's handwritten notes regarding what N. had said, were admitted in evidence, and the court was able to review them.

13

mean to her and that she doesn't like it, and so she knew she was there to talk about it."

During one of the first two sessions, N. told Clark that her father "touched her in her private parts, that he takes off his clothes." Clark continued: "And I did ask specifically, you know, just to go swimming or -- I like to give menus to children that young, because it helps them to answer the question. And she said, no, for no real reason -- no real reason, that he just takes off his clothes, and she doesn't like it. And also that she is afraid of him, that she runs from him; that when he tried to touch her, she spit in his face. [¶] Because when I asked her how she felt when he tried to touch her, she said brave. I remember her saying brave. And I thought that was -- at first, I was curious about that. And then she went on to say because she got mad and spit in his face and ran away and climbed on top of a shelf or a bookcase -- so it was enough reasonable suspicion for me to make a report."

N. consistently expressed having anger toward P.M. at her sessions with Clark. When Clark asked whether anyone had told her to say that she did not like P.M., she responded, " 'No. I think that.' "

Clark filed at least three reports with CWS regarding suspected abuse of N.

7. *P.M.'s testimony*

P.M. described meeting S.S. at a networking event for young professionals. He testified that they became friends and began dating in June 2002. According to P.M., although the pair stopped dating for some period of time, they began rekindling a romantic relationship in 2009. P.M. testified that he and S.S. discussed having a baby together. Later, according to P.M., they tried to conceive a child for a period of approximately six to nine months. The pair eventually went to a fertility center and began to use

14

"assistive reproductive technologies." P.M. stated that he spent approximately $75,000 for IVF services.[5]

P.M. testified about the incident at the hospital when he learned that he was not named on N.'s birth certificate. He acknowledged that he and S.S. "had a heated debate, an argument," but he denied yelling at S.S. P.M. also testified that he had not fully understood the meaning of the sperm donor agreement that he had signed, and he indicated that S.S. had told him that "everything would be the same" and that the document would be "for her [i.e., S.S.'s] protection" because a third-party egg donor would be involved. P.M. also contended that he did not realize that he had S.S.'s car keys in his possession when he left the hospital that day.

P.M. also testified that after S.S., S.S.'s mother, and N. traveled to India, but only S.S. returned after a month, he went to India and hired an attorney to try to see N.

When asked whether he had "yell[ed] at [S.S.] in front of [his] attorney" in December 2018, P.M. testified that after a court hearing in the parentage proceeding, he had a discussion with his attorney, and he was upset about some issues. However, the court sustained an objection that the content of his conversations was protected by attorney client privilege. The court instructed S.S.'s attorney to try to lay a foundation as to the possibility that the privilege had been waived by the fact that other people could hear the conversation. However, P.M. testified that he did not know whether other people could hear, and he said that he had been speaking with his attorney behind a closed door.

P.M. also testified about one of the occasions on which he arrived at S.S.'s condominium complex without having been invited. According to P.M.,

---

5    P.M. acknowledged that S.S. repaid him $20,000 in either 2015 or 2016.

he went there on N.'s birthday and he left gifts for N. with the building's security personnel. P.M. also noted that he does not stay in a vehicle when he comes to pick up N. because he walks and takes public transportation. With respect to the suggestion that he did not remain at the curb during scheduled exchanges of N., P.M. testified in a manner that suggested that he understood the word "curb" to mean where "[e]verybody" walks.[6]

P.M. denied sending the package of letters to S.S., and he testified that he had received anonymous letters

P.M. denied ever having abused N. in any way. He also denied ever having made threats against S.S. or her mother.

8. *S.S.'s testimony*

S.S. testified regarding the early relationship between her and P.M. While P.M. clearly considered them to have had a romantic dating relationship of some significance, S.S. described the relationship as involving intimacy at times, but in her view, they were not in a "committed relationship" other than during an early brief dating relationship. S.S. denied having tried "to conceive naturally with" P.M., and she stated that P.M. "convinced" her to allow him to be a sperm donor, which he said he was doing as her friend.

S.S. testified that P.M. "scream[ed]" at her during their dispute at the hospital regarding N.'s birth certificate. She stated that he said demeaning

---

[6] The record indicates that P.M. was shown photographs of where he was standing at certain times, and when he was asked by S.S.'s attorney whether he was "at the curb," each time P.M. answered affirmatively. The attorney also asked whether there was "space between you and the curb" with respect to multiple photographs, to which P.M. also answered affirmatively. The attorney then asked P.M., "So you can't be at the curb, can you?" This is when P.M. attempted to explain his understanding of what "curb" meant.

things about not having a man on the birth certificate and about S.S. being a woman.

S.S. testified about the trip to India, as well as about being served with the papers instituting the parentage action. S.S. also testified that she had heard that P.M. was "going around telling his friends, to social workers, to Hannah's House, everywhere, that I'm not the biological mother of my daughter." S.S. indicated that she is concerned about what might happen if N. were to hear that information.

S.S. testified that she feels "intimidated every time [P.M.] comes to pick up or drop off N." According to S.S., P.M. walks up to the door. S.S. never leaves the building, "[b]ut he always tries to come close to the door."

S.S. testified about N. "disclos[ing]" sexual abuse by her father to S.S. on June 18, 2019. According to S.S., N. said that P.M. had "touch[ed] her private parts" and took off his clothes, and took her hand and made her touch his penis. S.S. also testified that since P.M. had been "awarded parentage" there had been changes in N.'s behavior, including "having trouble in school suddenly," "[s]he was grinding her teeth," "[s]he was having major tantrums," "[s]he is fearing dark," and "she is fearful of little things" now.

E. *The trial court's ruling*

At the conclusion of the multiday hearing, the court issued its findings and rulings from the bench on July 9, 2020. At that time, the court stated:

> "All right. We had a -- an evidentiary hearing on [S.S.'s] request for a domestic violence restraining order. It was conducted on October 18, 2019; December 18, 2019; and then June 30, 2020. When the matter was concluded, we continued it to today's date for the Court to issue its ruling.
>
> "The Court has considered and weighed the totality of the evidence, including assessing the credibility of the parties and the witnesses. The Court finds that mother has not

17

met her burden of proof. The preponderance of the evidence fails to establish that father sexually abused the minor child or perpetrated any act of abuse against the mother.

"In this case, the allegations of abuse rise or fall on mother's credibility. And after the cross-examination of mother, the Court is unable to find mother credible in her testimony. One, her demeanor changed when she was under cross-examination. Her answers demonstrated evasiveness and, at times, when she was impeached, a lack of honesty in the Court's opinion. And I'm going to give some examples so the Court -- so the parties do understand how the Court viewed the evidence.

"We'll start with the e-mails. The Court found that it strained credulity that mom, or mother, rather -- I'm sorry-- who is an intelligent, educated person, at first couldn't even say whether she sent the e-mails to father, which impeached her testimony as to the length and nature of her relationship with father. And then there was testimony that she didn't recall the e-mails. When she was confronted with e-mails wherein she repeatedly told father that she loved him, she testified that she said that phrase 'I love you' to a lot of friends. I think that to any layperson looking at these e-mails, they clearly demonstrate a clear, romantic, and sexual relationship between the parties. Yet, for some reason, mother evaded those questions with semantics by testifying, for example, she did not know what Ms. Yum meant by the word 'romantic.'

"Mother testified under direct examination that father was a sperm donor through IVF and that they never tried to conceive naturally. The Court was left with a clear impression at the end of her direct examination that there had not been any sexual relationships -- or sexual relations between the parties. But then on cross-examination, mother was confronted with an e-mail, and she testified they did have a sexual but a not-committed relationship.

"The nature and extent of the parties' relationship is not necessarily probative to this Court of anything relevant

18

other than to establish the requisite relationship required under the Domestic Violence Prevention Act. But, sir, for some reason, to mother, it was significant enough that she was unwilling, in this Court's opinion, to be honest about that relationship. So in the end, if mother's not honest with the Court about this fact, the Court does not know what it can find credible in mother's testimony.

"Specifically as to the allegations that father has perpetrated abuse against mother, the Court found that the preponderance of the evidence did not establish that. The Court found there was also no credible evidence that father violated the temporary restraining order by sending mother a package with some foul language, and that, I believe, was admitted as Exhibit A.

"Detective Daniel Kline, who investigated the matter, testified there was no way to ascertain where the package came from or who sent it. And even mother testified under cross-examination that she has no personal knowledge of who[ ] mailed it. While Mr. Quirk and Ms. Yum believe that mother sent the package to herself and to her neighbors, the Court has no evidence of that, but the Court will say that there is something very strange about it all. The Court didn't find it credible that father would send a package that would be in violation of the TRO, that was meant to be anonymous, but would include a selfie picture. All in all, the Court did not find the preponderance of the evidence to establish abuse within the meaning of the DVPA against mother.

"With regards to the allegation of child abuse, again, this allegation the Court determined either falls or rises on mother's credibility. And in this regard, the Court received evidence that mother alleged on June 18, 2019, that the child told her during bath-time that father had touched her and made her touch him inappropriately. And the next morning, mother informed the child's pediatrician who, as a mandatory reporter, contacted Child Welfare Services.

19

"Mother also reported the matter to the police. And as a result, CWS and the police investigated the alleged child sexual abuse. The minor child was forensically interviewed by the professionals at Chadwick twice, on June 19 and August 29 of 2019. Detective Bianca, who was present for the first Chadwick forensic interview, testified that the child was firm, and it was -- and I'm going to use his words -- quote, a hard 'no' as to whether there was any sexual abuse. The child has also not made disclosures in the first CWS investigation.

"What the Court has is disclosure allegedly made only to the mother and then subsequently to Dr. Jennifer Davis and then to the child's therapist, Amy Clark. The Court examined those disclosures very closely and simply could not conclude that they're sufficient, even under a preponderance of the evidence, to establish that there was child sexual abuse.

"I looked at Dr. Davis's testimony. And while I find her credentials impressive, I did find her testimony to not rest on solid grounds. First, she testified -- and I'll quote -- 'As a physician, we try not to repeatedly interview those young children.' So she said she reached out to CWS and Ms. Clark and law enforcement in an attempt to request that they not repeatedly interview the child because children are suggestible. Yet contrary to that, it appeared to the Court from her testimony that she, at mother's urging, attempted to have the investigations reopened, which would result in additional interviews.

"She had an opinion about this matter, but the Court found that opinion to not rest on solid grounds because she never even watched the videotape of the forensic interview of the child at Chadwick, nor did she view the second videotape. And most importantly, she testified that it was based only on mother's statements that she became concerned the investigating authorities had sort of closed the case and moved on. And she expressed concern that the child had never been examined from a sexual abuse standpoint. And

20

so she then, on August 1, 2019, conducted that examination.

"Again, because the Court struggles with mother's credibility, I have to look at the origin of where Dr. Davis became concerned. On August 1, 2019, Dr. Davis met with the child and conducted what she called an examination. But based on her testimony, the Court couldn't find that that examination was any more or any less meaningful than what was done at the forensic interview.  It appears that while mother was present the entire time, she conducted a genital exam, there was no physical findings, and then began her interview with the question of 'Do you want to go back to the babysitter?'

"And she testified that the child went from bouncing around and playing to her changing very suddenly.  And based upon that change and demeanor, Dr. Davis believes that the child was a victim of sexual abuse. Dr. Davis further testified that the child then blurted out, 'But the babysitter did not actually touch my private part.  He was bouncing on pillows and tried to take my panties off.  He tried to do that, but he could not reach me.  I went way up high on a shelf, and he did not touch my private part.  He just gave up, nothing else, and that's when I went home with momma.  I don't want to go to the babysitter anymore, and I'll get a new babysitter.  It has to be a girl.'  And that was the end of the examination.

"Dr. Davis, again, had available and knew that there was videotape of the first interview, and she didn't go any further than that short interview with the child.  And from there, she concluded that the child had made a disclosure and was a victim of sexual abuse, and the Court has to examine the basis of her opinion, and the Court did not find the basis to be on solid grounds.

"The Court then looked at Amy Clark, the child's therapist. And here, Ms. Clark, who kept very detailed notes of those sessions, recounted what -- what the Court can only describe as fantastical stories by the child.  And just as

21

Detective Johnson testified, the Court finds it hard to just accept these stories as being truthful.

"And I'm going to contrast it shortly, the statements the child made to Dr. Clark -- I'm sorry -- Dr. [Davis] and Ms. Clark to the one that mother reports because they're qualitatively, significantly different. But to Ms. Clark, she made statements like 'Father sat on her head, the babysitter whose father tasted like 1,000 silly frogs and dusty socks, and she knew because she licked him when he bumped into her. The father peed and pooped on her face.' There were no other disclosures of explicit sexual conduct, but Detective Johnson clearly testified that he's not required to accept those fantastical statements, and the Court struggles with it the same way that Detective Johnson did.

"So we're left with the disclosure by mom. And I looked at the declaration she submitted in support of the request for the restraining order, and that disclosure the Court finds to be qualitatively different. If the mother is to be believed, and the child made that statement, this is the most explicit disclosure by the child of any sexual abuse. And in that, that disclosure is nothing close to what the child said during the forensic interviews, which is a hard "no," and then to Detective -- I'm sorry -- to Dr. [Davis] and Ms. Clark, which the Court has described as being a little bit more fantastical, but a denial of any actual sexual conduct.

"But mother, in her statement, reports that the child reported to her that 'The babysitter showed me his booty. He showed me his' -- she pointed to her vagina. She pointed at her buttocks. [S.S.] reported that the child said that 'He took off all his clothes, even his panties,' and then she said, 'Private parts. Private parts,' and -- and continued. And this was a very explicit [dis]closure, and it just -- other than to mother, no other independent third party has been able to testify that the child made such disclosures. So the Court had to weigh all of that in terms of credibility.

"The Court is aware of the significant history in this case, both with respect to the parentage and custody dispute, and I think it's hard to ignore that as the context for these allegations. But all in all, the Court ultimately concluded that the preponderance of the evidence did not establish the allegations by mother. And for those reasons, the Court denies her request for the domestic violence restraining order.

"The Court does tentatively find that father [is] entitled to attorney's fees and costs as the prevailing party under Family Code Section 6344(a). That's discretionary in the Court's view. It is appropriate in this case. However, the Court doesn't have sufficient information to determine what amount of fees and costs were incurred by father in connection to defending against this domestic violence restraining order request. So I'll set a date for that. And Mr. Quirk and Mr. Yum -- I'm sorry -- Ms. Yum can file with the court a declaration with proof of fees and costs."

The court issued a written document titled "FINDINGS AND ORDER AFTER HEARING" on August 25, 2020. This order states: "There were evidentiary hearings on Respondent's request for a domestic violence restraining order[ ] conducted on October 18, 2019; December 18, 2019; and June 30, 2020. When the matter was concluded, it was continued to today's date for the Court to issue its ruling."

"The Court has considered and weighed the totality of the evidence, including assessing the credibility of the parties and the witnesses. The Court finds that [S.S.] has not met her burden of proof. The preponderance of the evidence fails to establish that father sexually abused the minor child or perpetrated any act of abuse against the mother.

"THEREFORE, the Court denies her request for the domestic violence restraining orders for the reasons explained at length at the hearing on July 9, 2020 . . . ."

23

F. *Proceedings on appeal*

1. *S.S.'s August 13, 2021 request for judicial notice*

On August 13, 2021, S.S. filed a request for judicial notice seeking to have this court judicially notice five documents: (1) the December 5, 2018 stipulated judgment between the parties; (2) a document titled "Child Victim-Witness Protocol," described by S.S. as having been "developed and updated by the San Diego County Child Victim-Witness Protocol Committee"; (3) "Assembly Committee on Judiciary, Analysis of Sen. Bill No. 792 1999-2000 Reg. Sess., as amended 7/12/1999 (legislative history regarding enactment of Family Code § 3027.5 involving reports of sexual abuse)"; (4) P.M.'s "Reply Declaration, dated 1/27/2021 (relating to P.M.'s request to reduce his monthly child support payments)"; and (5) "Report dated June 19, 2019, prepared and filed directly with the trial court by Health & Human Services Child Welfare Services (CWS)." P.M. did not oppose this request for judicial notice.

We grant the request for judicial notice with respect to item 1, the stipulated judgment between the parties entered on December 5, 2018, and item 4, the "Reply Declaration, dated 1/27/2021," which are records of a court of this state (Evid. Code, §§ 452, subd. (d), 459). We also grant the request for judicial notice of item 5, the "Report dated June 19, 2019, prepared and filed directly with the trial court by Health & Human Services Child Welfare Services (CWS)." (See Evid. Code, §§ 452, subd. (c), 459.)

We deny the request for judicial notice with respect to item 3, the Assembly Judiciary Committee's written analysis of Senate Bill No. 792, given that such matters need not be judicially noticed: "A motion for judicial notice of published legislative history, such as the . . . analysis here, is unnecessary. [Citation.] 'Citation to the material is sufficient. [Citation.]

24

We therefore consider the request for judicial notice as a citation to those materials that are published.' [Citation.]" (*Wittenburg v. Beachwalk Homeowners Assn.* (2013) 217 Cal.App.4th 654, 665, fn. 4.)

Finally, we deny the request for judicial notice with respect to item 2, a document titled "Child Victim-Witness Protocol," described by S.S. as having been "developed and updated by the San Diego County Child Victim-Witness Protocol Committee." With respect to item 2, the question of the relevance of and weight to be given to Dr. Davis's contentions regarding the sufficiency of the procedures undertaken at the Chadwick Center with respect to N., including the nature and length of the forensic interview offered to N., as well as the relevance and weight to be given to the testimony and other evidence regarding the forensic interviews completed at the Chadwick Center, are questions for the trial court to consider in the first instance. S.S. has not demonstrated that the "Child Victim-Witness Protocol" document was presented to the trial court for its consideration. Because the trial court did not have an opportunity to consider this document in the context of the other evidence presented at the hearing, we decline to take judicial notice of the document on appeal. (See *People v. Hardy* (1992) 2 Cal.4th 86, 134 [" '[A]s a general rule the [appellate] court should not take . . . [judicial] notice if, upon examination of the entire record, it appears that the matter has not been presented to and considered by the trial court in the first instance.' [Citation.] Such a rule prevents the unfairness that would flow from permitting one side to press an issue or theory on appeal that was not raised below"].)

2. *P.M.'s December 27, 2021 request for judicial notice and S.S.'s December 30, 2021 request for judicial notice*

P.M. filed a request for judicial notice on December 27, 2021, seeking judicial notice of a letter purportedly written by a therapist who provided conjoint therapy to P.M. and N., dated December 13, 2021. S.S. opposed the request for judicial notice.

S.S. filed a second request for judicial notice on December 30, 2021, which P.M. did not oppose, seeking judicial notice of two documents: (1) a letter seeking depublication of an appellate opinion involving the standards to be applied in assessing a DVRO request, authored by the judge who presided over the proceeding in this case, and (2) a Supreme Court docket entry reflecting that the Court ordered depublication of the appellate opinion on November 10, 2021.

The parties have not persuaded us that these documents are relevant to the issues before us in this appeal. We therefore deny the requests for judicial notice dated December 27, 2021 and December 30, 2021. (See, e.g., *Gonzalez v. City National Bank* (2019) 36 Cal.App.5th 734, 760, fn. 13 [declining to take judicial notice of letters issued by the State Department of Health Care Services because the materials "have, at best, marginal relevance to the issues before" the court].)

### III.

### DISCUSSION

S.S. appeals from the trial court's order denying her request for a DVRO against respondent P.M., as well as from the court's award of attorney fees and costs to P.M.

S.S. raises several arguments in seeking reversal of the denial of her request for a DVRO. For example, S.S., contends that the trial court erred in

refusing to "credit the testimony" of S.S.'s experts regarding their opinions that N. may have been sexually abused by P.M. She also contends that the trial court erred in failing to find that P.M. violated the temporary restraining order when he "engaged in coercive behavior that disturbed S.S.'s and N.'s peace when he disclosed S.S.'s confidential fertility and reproductive health information. (Some capitalization omitted.) S.S. further contends that the trial court applied an incorrect legal standard in assessing P.M.'s "non-violent acts" that, according to S.S., "destroyed" (capitalization omitted) her mental or emotional calm.

A. *General standards applicable to DVROs*

"Under the D[omestic] V[iolence] P[revention] A[ct] [(DVPA)], a court may issue a restraining order to prevent domestic violence or abuse if the party seeking the order 'shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.'" (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 367.) "Abuse" includes intentionally or recklessly causing or attempting to cause bodily injury to, sexual assault, placing a person in reasonable apprehension of imminent serious bodily injury, attacking, striking, stalking, threatening, battering, harassing, destroying personal property, or disturbing the peace of the other party. (Fam. Code, §§ 6203, 6320.) " '[T]he plain meaning of the phrase "disturbing the peace of the other party" in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party.'" (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602; see also § 6320, subd. (c) [amending the statute effective January 1, 2021 to define " 'disturbing the peace of the other party' " consistent with caselaw].)

The denial of a DVRO is appealable. (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 332; see Code Civ. Proc., § 904.1, subd. (a)(6).)

27

"The standard of review for an order denying injunctive relief is abuse of discretion, because ' " 'granting, denial, dissolving or refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon consideration of all of the particular circumstances of each individual case' " . . . . [Citation.]' [Citation.]" (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495.) "This standard applies to a grant or denial of a protective order under the DVPA. [Citations.]" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420.) "At the outset, however, we must determine whether the trial court applied the correct legal standard to the issue in exercising its discretion, which is a question of law for this court. 'The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion.' [Citation.]" (*Id.* at pp. 420–421.)

In addition, in reviewing the trial court's factual findings made in connection with an order granting or denying a protective order, we apply the substantial evidence rule. (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 822–823.) The inquiry is whether substantial evidence supports the court's finding, not whether a contrary finding might have been made. (*In re Alexandria P.* (2016) 1 Cal.App.5th 331, 355.) We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the judgment. (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.)

B.  *The trial court did not commit reversible error in declining to credit the opinions of S.S.'s expert witnesses*

S.S. first argues that the trial court erred in discounting the opinions of her experts, Clark and Dr. Davis. S.S. contends that the court

"mischaracterized and then arbitrarily disregarded the uncontroverted and unimpeached expert opinion of" (underscoring omitted) Clark and Dr. Davis. Although S.S. phrases her contentions in this section of her brief in such a way as to suggest that her challenge is to a *legal determination* made by the trial court, in certain portions of this argument she acknowledges that it was within the trial court's *discretion* whether to credit, and if so, to what degree, the testimony of all of the witnesses who testified at the hearing—including the expert witnesses, and that the court's view of the conclusions to be reached from the evidence is entitled to great deference, and may be reversed only if there is no substantial evidence to support the court's ruling.[7] S.S.'s argument is, therefore, at its essence, a request that this court reweigh the evidence and conclude that the trial court should have given greater credence to the testimony of S.S.'s expert witnesses.

Because S.S.'s contention is, in effect, a challenge to the trial court's findings of fact that are inconsistent with the testimony provided by S.S.'s expert witnesses, we begin with a recitation of familiar standards that we are to apply on appeal with respect to findings of fact. First, it is beyond question that an appellate court's reviewing power with respect to factual findings "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support" the trial court's findings. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.) In making this determination, a trial court's factual findings are liberally construed to support the

---

[7]     At one point in her opening brief, S.S. concedes that her argument is that the trial court "abused its discretion in rejecting Dr. Davis' expert opinion without the existence of any opposing opinion of a qualified medical expert," and elsewhere notes that her argument, "[s]tated differently" is that "there is no substantial evidence to support the court's ruling."

judgment, and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)

"So long as there is 'substantial evidence,' [we] must affirm, even if [we] would have ruled differently had [we] presided over the proceedings below, and even if other substantial evidence would have supported a different result." (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208.) It thus follows that if more than one rational inference can be deduced from the facts, an appellate court may not replace the trial court's conclusions with its own. (*Tellis v. Contractors' State License Bd.* (2000) 79 Cal.App.4th 153, 158.) Stated differently, where, as here, " 'the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (S*onic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

"It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation.] 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' [Citation.]" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).) Beyond these well-established standards, it is also clear that a trial court is not bound by the fact that certain evidence may be uncontradicted, and "where uncontradicted testimony has been rejected by the trial court, it 'cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be

30

disbelieved.' " (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.) With respect to expert testimony, in particular, a fact-finder is free to draw inferences and conclusions at odds with such testimony, even if the expert testimony is uncontradicted. (See *Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 170–172 ["expert testimony," even if uncontradicted, does not "exclude consideration of other facts which are pertinent to the issue involved"].)

Given these standards, we are compelled to conclude that the trial court did not err in its assessment and weighing of the evidence. S.S. contends that "there is very little evidence of any kind to counter the overwhelming evidence that P.M. sexually molested N., and what exists is solely [P.M.'s] self-serving testimony and a detective with a clear lack of the necessary expertise required to assess child sexual abuse, in contrast to that of Dr. Davis and Ms. Clark." In making this assertion, S.S. essentially devalues the contradictory evidence that was presented in the trial court. P.M. testified, credibly in the trial court's view, that he never sexually abused N. P.M.'s testimony, alone, constitutes substantial evidence to support the trial court's conclusion that the alleged sexual abuse did not occur. (See *Thompson, supra*, 6 Cal.App.5th at p. 981 [a single witness's testimony is sufficient evidence to support a trial court's finding].) In addition, a detective testified that, in his view, there was not credible evidence to support a determination that the accusations against P.M. were true. Further, the evidence demonstrated that N. participated in two forensic interviews conducted by professionals at the Chadwick Center, and she did not make any disclosures during those interviews that led any of the professionals involved to suspect that sexual abuse had occurred. Essentially, S.S. is insisting that the trial court was required to credit Clark and Dr. Davis's

opinions over the other evidence presented at the hearing.  We disagree.  The court was entitled to rely on the other evidence and to give that evidence greater weight, even though it conflicted with the opinions of S.S.'s two experts.

Even assuming, however, that S.S. was correct in asserting that there was "very little" evidence contradicting the opinions of Clark and Dr. Davis— a contention with which we disagree—an appellate court does not involve itself in the assessment of credibility or the *weighing* of evidence, and we do not insert our own view of the evidence to reach a different result if there is substantial evidence to support the trial court's determinations.  (*Thompson, supra*, 6 Cal.App.5th at p. 981.)  Thus, even if we might not have discounted the testimony and opinions of Clark and Dr. Davis to the same degree that the trial court did if assessing their testimony in the first instance, it is not our role on appeal to second guess the trial court's decision with respect to the weight to give any particular evidence or testimony.  (See, e.g., *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 262 ["[T]he court is better positioned than are we to observe a witness's demeanor and discern his or her credibility"].)

Among the arguments that S.S. levels against the trial court is that the court "erred when it assumed the role of an amateur psychiatric clinician when it found S.S. failed to present evidence of sexual abuse."  First, the trial court did not conclude that S.S. failed to present evidence of abuse; rather, the court concluded that S.S. failed to meet her burden to demonstrate, by a preponderance of the evidence, that abuse occurred.  In addition, the court properly relied on other evidence and the testimony of other witnesses whose opinions were contrary to those offered by Clark and Dr. Davis.  Contrary to S.S.'s suggestion, a trial court may properly consider its own observations,

32

and weigh them against expert testimony or other available evidence. (*People v. Rodas* (2018) 6 Cal.5th 219, 234.)

S.S. contends that the trial court should have " 'presume[d]' " that the expert testimony of Clark and Davis " 'was true' " because it was not inherently improbable. However, it is clear from the transcript that the court was troubled by the fact that S.S. was intimately involved in the examinations and sessions conducted by Clark and Davis, and that S.S. was apparently present when N. made statements that these experts determined constituted disclosures of sexual abuse. S.S. suggests that the trial court "took a bizarre view of the relationship between S.S., N., Dr. Davis, and Ms. Clark, and accused them of a *folie a quatre*—a purported but questionable syndrome characterized by the transference of delusional ideas from one person to three other persons." (Footnotes omitted.) We disagree with S.S.'s over-the-top assessment of the trial court's view of this matter. Rather, we view the record as demonstrating that the trial court was concerned that, as many of the witnesses at this hearing conceded, a young child such as N. could be easily influenced by certain types of questioning, commentary, and even body language, and that it was possible that S.S. had, intentionally or unintentionally, influenced N. in ways that caused her to say things about P.M. to Clark and Davis that she might not otherwise have said. The court was also clearly concerned that S.S.'s experts had been exposed only to S.S.'s version of the history of the case and S.S.'s statements about what N. had disclosed. In view of the court's assessment that S.S. was not entirely credible, the court was concerned that these experts had been, at least in part, influenced by a narrative provided by someone the court concluded was an unreliable narrator. In addition, the court noted a concern arising from the fact that Dr. Davis had offered an opinion that certain

33

protocols had not been followed with respect to the forensic interviews of N., yet Dr. Davis had not watched the video of either interview to independently assess how they were conducted and, instead, relied solely on S.S.'s reports regarding the interviews and subsequent closure of the investigation. For these reasons, the court discounted Dr. Davis's opinions about purported problems with other evidence in the case, including the two forensic interviews. The court did not abuse its discretion or otherwise err in limiting the weight to be accorded to these experts' testimonies, given the court's concerns about the foundations of their opinions.

We therefore reject S.S.'s challenge to the trial court's treatment of S.S.'s experts' opinions.

C. *The trial court did not err with respect to its treatment of other evidence of alleged abuse*

1. *The court did not err in "failing to find that P.M. violated the TRO . . . when he disclosed S.S.'s confidential fertility and reproductive health information"*

S.S. contends that the trial court erred because it "offered no evidentiary basis for its failure to find that (a) P.M.'s disclosure of S.S.'s protected and confidential medical information regarding her fertility and reproductive health disturbed S.S.'s and potentially N.'s peace; and (b) therefore he violated the TRO, itself constituting another form of domestic abuse and basis for a permanent restraining order." (Fns. omitted.)

S.S. concedes that her "DVRO petition and the TRO do not specifically say that [P.M.] should stop sharing private medical information and making this false claim"; she nevertheless contends that "the general statement in the TRO enjoining him from disturbing her peace is sufficient to put him on notice of the prohibited conduct." However, S.S. fails to acknowledge that she not only failed to raise this as an issue in her petitioning documents, but in

34

addition, during the hearing, she did not request a permanent order precluding P.M. from making such statements. Thus, while S.S. did testify that she was troubled by P.M.'s discussing her private medical information with others and her fear of the impact that this information would have on N. if N. were to learn of it, S.S. made no request at the hearing for an order prohibiting P.M. from sharing this information with others. Further, even after the trial court provided its oral statement of its findings and conclusions, during which the court did not make any findings with respect to the allegations regarding P.M.'s disclosures of S.S.'s confidential medical information, S.S. raised no concern or objection about the court's failure to address that issue.

The fact that the trial court did not address every incident about which the parties testified during the hearing does not provide a basis for a claim of error, particularly where the record does not demonstrate that S.S. raised any objection to the court's failure to address the issue. Although the DVPA does provide that "[t]he court shall, upon denying a petition under this part, provide a brief statement of the reasons for the decision in writing or on the record" (§ 6340, subd. (b)), there is no requirement that the court address every issue or make specific factual findings related to every allegation in a petition or testified to by a witness during a hearing. It was incumbent on S.S. to ask the court to address, *specifically*, the issue of the alleged disclosure of private medical information if she wanted the court to issue an injunction prohibiting this conduct. Because S.S. failed to raise this issue in the trial court, she may not contend for the first time on appeal that the trial court did not handle the issue properly. (See, e.g., *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 (*Johnson*) [" '[N]o reason appears why we should not apply the established rule[ ] . . . that issues not raised in the trial court

35

cannot be raised for the first time on appeal' "].)  In the absence of any request of the court with respect to this conduct, S.S. has forfeited the argument that the court erred in not finding that S.S.'s allegations regarding the disclosure of private medical information constituted abuse and required the imposition of a restraining order.

Further, we would reject S.S.'s contention on the merits.  Because the record is silent with respect to how the trial court viewed this evidence, we must presume that the trial court made implied findings of fact to support its conclusion that S.S. failed to establish past abuse by a preponderance of the evidence.  (*Estate of O'Connor* (2017) 16 Cal.App.5th 159, 169 (*Estate of O'Connor*) ["[w]e presume that the trial court['s] order is correct, and imply findings that are necessary to support" the order]; see *Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320 ["[u]nder the doctrine of 'implied findings,' if the record is silent, we must presume the trial court fully discharged its duty to consider all of the relevant factors and made all of the factual findings necessary to support its decision for which there is substantial evidence"].)  Alternatively, the DVPA's statutory language makes clear that a trial court is not compelled to issue a restraining order where it concludes, *based on the totality of the evidence*, that a restraining order is not warranted, even if past abuse has been found.  (See § 6300, subd. (a) ["An order *may* be issued under this part to restrain any person for the purpose specified in Section 6220" where the evidence "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse" (italics added)].)  As a result, even if we were to assume that these incidents were sufficient to support a finding of past abuse and that the trial court found that they constituted abuse, the court could have reasonably concluded that, despite these incidents, a permanent restraining order was not necessary based on the full record before it.  (See *In*

36

*re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1499, fn. 8 ["the fact that a trial court finds past abuse does not require that the court issue a restraining order; rather, a court may decline to issue a restraining order"].) Applying the relevant principles to the record here, we cannot say that no reasonable court would have denied the request for a restraining order under these circumstances.

    2.   *S.S. has not demonstrated that the trial court "applied the wrong legal standard" to its consideration of the alleged violent acts of P.M. in denying the request for a DVRO*

S.S. contends that "the trial court applied the wrong legal standard to P.M.'s other non-violent acts that destroyed S.S.'s mental or emotional calm." (Some capitalization omitted.) Specifically, S.S. contends that the court "erred in failing to properly address" the "pattern of harassment" that was "uncontroverted in the evidence and in testimony." This conduct includes the incident at the hospital when P.M. became upset about not being named as N.'s father on the birth certificate, P.M. coming to the door of S.S.'s downtown condominium building, rather than waiting curbside as provided for in the custody order, P.M. "trespassing" at the condominium complex by entering the lobby area uninvited, P.M. "screaming obscenities at S.S. in the courthouse," and P.M. "travelling to India to stalk and harass S.S.'s mother and insisting on seeing N. (before he was granted parentage)." According to S.S. the trial court "disregarded these prior acts showing P.M.'s propensity for engaging in abusive conduct because S.S. did not specifically allege the misconduct in her DVRO petition."[8]

---

8    Although S.S. frames her argument using the phrase "wrong legal standard," she does not identify the purportedly erroneous "standard" applied by the court, and, instead, appears to contend that the trial court erred in

As we have previously stated, the fact that the trial court did not address every incident mentioned during the hearing does not provide a basis for a claim of error. The DVPA does not impose a requirement that the court make specific factual findings as to every allegation of abuse. (See § 6340, subd. (b) ["[t]he court shall, upon denying a petition under this part, provide a brief statement of the reasons for the decision in writing or on the record"].) The record does not demonstrate that S.S. ever raised the issue of the trial court's failure to specifically discuss its findings with respect to the past acts of alleged abuse, or why the court was not relying on those acts to issue a restraining order. We need not address the issue because it is being raised for the first time on appeal. (See *Johnson, supra*, 47 Cal.4th at p. 603.)

However, even if we were to consider the argument on its merits, we would conclude that is unavailing. First, the record does not support S.S.'s assertion that the trial court "disregarded these prior acts . . . [on the ground that] S.S. did not specifically allege the misconduct in her DVRO petition." The portion of the transcript to which S.S. cites as supporting this assertion indicates only that, at one point, the court appeared to have forgotten what S.S. had alleged in her DVRO petition, stating, "And we're going to take our lunch break and resume at 1:30. And I don't remember seeing it, so I'm going to have to review. I just don't remember the allegations of abuse raised in the DV100 going back as far as the history we've been covering today." Because the court indicated that it was going to review the documents, and the record is silent as to whether the court did so, we presume, in favor of the order, that the court did review the DVRO petition and reacquainted itself with the allegations in the petition. (See *Denham v. Superior Court* (1970)

---

failing to consider the past acts of abuse and/or in failing to rely on those acts to issue a restraining order.

2 Cal.3d 557, 564 (*Denham*) [" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown' "].)

Moreover, this same foundational appellate rule requires us to presume that the trial court made findings of fact to support its conclusion that S.S. failed to establish past abuse by a preponderance of the evidence. (See *Denham, supra*, 2 Cal.3d at p. 564; see also *Estate of O'Connor, supra*, 16 Cal.App.5th at p. 169.) The court did not believe S.S.'s testimony, generally, and instead credited P.M.'s version of the events of alleged abuse that were discussed during the hearing. Thus, while S.S. asserts on appeal that P.M. effectively conceded that this other abusive conduct occurred, the record does not support this contention.[9] Rather, the court's statements indicate that the court did not believe S.S.'s version of events, and/or did not believe that S.S.'s peace had been disturbed by P.M.'s actions. Again, the court stated, "The Court has considered and weighed the totality of the evidence, including assessing the credibility of the parties and the witnesses. The Court finds that mother has not met her burden of proof. The

---

[9] Although S.S. contends that P.M. "confirmed" that he left the hospital angry, with S.S.'s car keys, P.M.'s testimony about these events confirmed merely that he and S.S. engaged in a "heated debate." He denied having "yell[ed] at her." He further testified that he "just left" after the argument, and did not realize that he was still in possession of her car keys when he left. Moreover, P.M. testified that he returned the keys to S.S. "[m]aybe a few days later," and that he had tried "reaching out to her multiple times on multiple days." S.S. offered a different version of these events—one that suggested far more malign intentions and conduct on P.M.'s part. The same is true to some extent with respect to the other incidents that S.S. alleged as constituting past abuse. The trial court clearly found P.M.'s version of the entire history between the parties more credible than S.S.'s version.

preponderance of the evidence fails to establish that father sexually abused the minor child or perpetrated *any act of abuse* against the mother." (Italics added.)[10] Given the court's clear statement that it did not find that S.S. had met her burden to demonstrate that the alleged abuse had occurred, to the extent that the court did not expressly address any of the specific incidents in its oral ruling, we *must imply* that the court made findings with respect to all of these events in a manner that supports the trial court's ultimate determination that S.S. failed to meet her burden with respect to her petition for a DVRO. (See, e.g., *Denham, supra*, 2 Cal.3d at p. 564.)

D. *The record does not support S.S.'s contention that the trial court "abused its discretion by relying on pseudo-scientific notions of parental alienation"*

S.S. filed a motion in the trial court to "exclude speculative and improper lay opinion testimony regarding parental alienation" or Parental Alienation Syndrome (PAS) because, she contends, P.M. "raised parental alienation as his primary defense in his written response to the DVRO petition." In her motion, S.S. argued that such testimony constituted "inadmissible pseudo-science." As S.S. concedes, although the trial court denied her motion in limine because P.M. had not designated an expert to testify on "parental alienation," the court permitted S.S. to renew her objection during the proceedings if P.M. were to raise the issue. According to S.S., the court "nevertheless proceeded to entertain extensive argument

---

10 The court elsewhere similarly stated, "[A]ll in all, the Court ultimately concluded that the preponderance of the evidence did not establish the allegations by mother."

based on parental alienation and to render findings and a decision that were based in large part on the alienation concept."[11]

S.S.'s argument appears to be that the trial court, while not expressly relying on "PAS," nevertheless failed to consider that S.S.'s conduct vis-à-vis P.M. might have been justified as an attempt to protect her daughter from abuse, rather than an attempt to undermine P.M.'s relationship with N. For example, S.S. states:

> "The court abused its discretion because it refused to take seriously the obvious verbal and non-verbal indications from N. that she was being molested by her father. Rather, in accord with alienation theory that blames protective mothers for children's estrangements from fathers, the

---

[11]     On February 1, 2022, after full briefing in this case was complete, a group of nonprofit organizations—The Domestic Violence Legal Empowerment and Appeals Project, The California Women's Law Center, and Community Legal Aid SoCal (jointly "amici") filed an application to file a brief in support of S.S.'s appeal, pursuant to California Rules of Court, rule 8.200(c). On February 18, 2022, this court granted the application by amici and the brief was filed in this case.

Amici state that they "are organizations that represent and advocate for family violence and domestic sexual abuse victims, primarily in the domestic violence restraining order and custody context."

The brief filed by amici in this case focuses on their concerns regarding the deleterious effects of the application of " 'parental alienation syndrome' (PAS)" by courts in custodial conflict cases, particularly when used to discredit evidence that would support justified estrangement of the child from a disfavored parent (such as situations in which abuse is occurring). We have read and considered the brief submitted by amici, and understand the position that amici take with respect to concerns regarding the use of claims of parental alienation. However, to the extent that amici raise issues that are not encompassed by S.S.'s arguments on appeal, we decline to separately address them. (See *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 572 ["An amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae"].)

court focused solely on S.S. as the source of N.'s estrangement from P.M."

This description fails to acknowledge the full record before the court, and ignores the substantial evidence that supports the trial court's conclusions. For example, S.S.'s argument that N.'s statements and behavior were "obvious" indications of molestation ignores the fact that there were witnesses who disagreed with the assessment that N. had been subjected to sexual abuse. In addition, the court clearly expressed skepticism about S.S.'s role in the situations in which N. did make statements that, according to Clark and Dr. Davis, were disclosures of sexual abuse. That is clearly within the role of a factfinder faced with contradictory evidence. The trial court acts within its purview in considering the credibility of the witnesses and in deciding who and what to believe; it is the nature of the court's task to consider all of the evidence, weigh it, and determine the reasonable inferences to be drawn from it in order to reach factual conclusions. That is what the court did here.

S.S.'s argument conflates the concept of evidence of a parent's conduct that demonstrates that the parent is unsupportive of the other parent's relationship with the child with evidence of "Parental Alienation Syndrome," a "syndrome" that appears to have no diagnosable criteria. In this case, for example, the record does not support the idea that the trial court "rel[ied] on pseudo-scientific notions of parental alienation" (capitalization omitted) in reaching its conclusions. Rather, the trial court rejected the notion that evidence regarding so-called "Parental Alienation Syndrome" would be admitted at the evidentiary hearing, stating: "I'm not allowing any arguments for evidence of parental alienation as that syndrome as you presented in your motion in limine. But as I stated at the beginning of our

hearing this morning, I think that any evidence, direct or circumstantial, regarding whether or not Mom supports the relationship [between N. and P.M.] is [relevant] because of the manner of the reporting in this case."

The court was well aware of the history of the case, including a very contentious parentage action. The evidence demonstrated that S.S. referred to P.M. as N.'s "babysitter" for much of N.'s early life. Although S.S. justifies this conduct by contending that P.M. had agreed to be nothing more than a sperm donor, the evidence presented demonstrated that even after the parties stipulated to P.M.'s parentage, both S.S. and N. continued to use the "babysitter" title. The court was also aware of other conduct—conduct that occurred prior to the accusation of sexual abuse—that could be viewed as S.S. being unsupportive of P.M. having any relationship with N.

Further, the court did not rely on P.M.'s arguments that alienation was occurring in concluding that sexual abuse had not been proven by a preponderance of the evidence. Rather, the court relied on evidence presented at the hearing, including other statements that N. had made expressly denying that any such abuse had occurred, as well as the testimony of professionals who assess children when abuse has been alleged, to conclude that there was insufficient evidence that the alleged abuse had actually occurred. This record thus belies the argument that the court relied on an improper "theory" of parental alienation in declining to credit S.S.'s testimony regarding N.'s alleged disclosure of sexual abuse. The court considered the entire body of evidence, as well as the determinations of credibility that it made based on the demeanor of and statements made by the witnesses during the hearing, as well as impeachment evidence.

In sum, by raising the specter of "Parental Alienation Syndrome," S.S. fails to acknowledge that a court may *properly* consider evidence that one

43

parent is not supportive of the other parent's relationship with the child when considering child custody and related issues. (See *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1085 ["[T]he mother is not purposely trying to alienate the children from their father, but . . . the mother's inability to 'let go' of her anger toward the father caused her to project those feelings onto their children and to reinforce the children when they expressed negative feelings toward their father"].) Indeed, it is clear that a parent's *statements and actions* that result in undermining the relationship between the child and the other parent, whether undertaken consciously or unconsciously, are the proper subject of concern for a court. (*Ibid.*) The argument made by S.S. and amicus curiae regarding parental alienation could have the effect of precluding a court from considering evidence that a parent's conduct or words demonstrate lack of support of the other parent's relationship with the child when assessing matters affecting child custody.

In addition, the argument presented by S.S. and amici regarding parental alienation is, at its foundation, dismissive of the trial court's role in assessing witness credibility and in determining which version of events is closer to reality when two parties come into court and present competing historical narratives. The court in this case did not rely on the theory of parental alienation in concluding that S.S. was not credible and in finding that abuse had not been proven by a preponderance of the evidence. Rather, the court found S.S. not credible because of what she said, some of which was impeached by other evidence, as well as her demeanor. In sum, there is nothing in the record that suggests that the court was improperly influenced by "pseudo-scientific notions" of parental alienation.

E.  *S.S.'s additional substantive arguments in her reply brief were not fairly raised in the opening brief or in respondent's brief and, in any event, are not supported by the record*

In her reply brief, S.S. sets forth two related substantive arguments that she did not raise in her opening brief and that are not responsive to arguments raised in respondent's brief.[12]

Both of the substantive contentions raised in S.S.'s reply brief stem from her assertion that a recent appellate opinion authored by the judge who was the judge in the trial court who made the ruling that is the subject of this appeal constitutes "eviden[ce] that [the judge's] misreading of the statute tainted her view of the evidence S.S. presented at the DVRO hearing." Specifically, S.S. relies in significant part on the fact that the Supreme Court ordered the opinion depublished when it denied the petition for review.  S.S. argues that the judge, as the author of the opinion in question, erroneously added two reasonableness-related requirements that a party seeking a DVRO must meet in order to establish abuse under the DVPA—requirements that,

---

[12]  S.S. also raises a procedural complaint in her reply brief, arguing that P.M.'s respondent's brief contains many factual assertions that P.M. not only fails to support with citations to the record, but that could not be supported by citations to the record because they do not appear in the record.

We agree with S.S. that we must disregard the statements in P.M.'s respondent's brief that S.S. identifies as being unsupported by citations to the record and/or unsupported by the record itself.  "Each and every statement in a brief regarding matters that are in the record on appeal, whether factual or procedural, must be supported by a citation to the record.  This rule applies regardless of where the reference occurs in the brief.  [Citations.]" (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 96.)  Further, and even more fundamentally, "when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813.)

according to S.S., are not derived from the statutory language. S.S. contends that it is therefore "evident" that the judge applied these incorrect "reasonableness" standards to the evidence in this case to reach the conclusion that S.S. failed to prove that the alleged abuse occurred. S.S. also argues that this court should view the appellate opinion as evidence that the judge, when acting as the trial judge in this case, did not appreciate "the difference between 'coercive control' and 'disturbing the peace.'" (Underscoring omitted.)

To begin with, " '[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' [Citation.]" (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Although it is clear that the authority on which S.S. is relying—i.e., the Supreme Court's order depublishing the opinion on which S.S. is relying was not issued until after S.S. had filed her opening brief, if S.S. wanted to rely on this authority, she should have sought leave to file a supplemental brief, which would have provided this court with an opportunity to receive a response from P.M. (See *Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2019) 43 Cal.App.5th 988, 1003; see also *Reichardt v. Hoffman, supra*, 52 Cal.App.4th 754, 764–766.)

In any event, S.S.'s contention lacks merit. First, neither we, nor S.S., can presume to know the reason for the Supreme Court's decision to order that the opinion in question be depublished. S.S. suggests that the Supreme Court was concerned with the opinion's analysis of the statutory language and in particular, its inclusion of "reasonableness" standards that she contends are not found in that language. However, the Supreme Court denied the petition for review and made no comment to explain its

46

depublication decision. It is not our place, nor S.S.'s, to indulge in speculation as to why the Supreme Court ordered the opinion depublished. Further, even if we were to assume that S.S.'s contention as to the Supreme Court's reason for ordering the opinion depublished were correct, the conclusions that she asks us to draw from the fact that the same judge who authored that opinion presided over these DVRO proceedings are untenable. As we have previously explained, the court's conclusion as to S.S.'s failure to sufficiently prove her allegations of abuse are rooted in the court's conclusion that S.S.'s version of the events about which she testified was not credible. We have found nothing in the record, and S.S. has pointed to nothing, that would indicate that the court applied any improper "reasonableness" standards to the determination as to whether S.S. met her burden to establish past abuse by a preponderance of the evidence.

F.  *Challenge to the attorney fee award*

Although S.S. does not set forth a separate argument challenging the trial court's attorney fee award in favor of P.M., she indicates in her opening brief that she questions whether an attorney fee award such as the one ordered in this case could be "in the best interest of the child." Relying on *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1509 (*Loeffler*), she contends that the attorney fee award of $55,154 in attorney fees and costs " 'shocks the conscience and suggests that passion and prejudice influenced the determination.' " (*Ibid.*)

A trial court may award attorney fees to a prevailing party in a DVRO proceeding pursuant to section 6344, subdivision (a), which states that in connection with a proceeding concerning a domestic violence restraining order, "[a]fter notice and a hearing, the court may issue an order for the payment of attorney's fees and costs of the prevailing party." (§ 6344,

47

subd. (a); see *Loeffler, supra*, 174 Cal.App.4th at p. 1508.) "We apply an abuse of discretion standard in reviewing the amount of an attorney fee award. [Citation.] '[A]n experienced trial judge is in a much better position than an appellate court to assess the value of the legal services rendered in his or her court, and the amount of a fee awarded by such a judge will therefore not be set aside on appeal absent a showing that it is manifestly excessive in the circumstances.' [Citation.] 'The only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination.' [Citation.]" (*Id.* at p. 1509.)

S.S. suggests that the trial court's attorney fee award " 'shocks the conscience' " because the amount is excessive. However, the court considered billing records from P.M.'s attorneys showing the fees and costs incurred in representing P.M. in this multi-day, multi-witness hearing. In addition, the court specifically noted that the "DVRO litigation has been extensive and serious."

Despite suggesting that the attorney fee award is excessive on the whole, S.S. does not identify any item or cost that she contends is unreasonable; rather, she objects generally because the award "further[ed] the devastation that parental alienation brought down on S.S. who sought only to protect her daughter." Unfortunately, this argument is insufficient to demonstrate that the court abused its discretion in ordering the award of attorney fees.[13]

_____

13    In addition, amici suggest that the trial court's award of attorney fees was excessive because "[t]his is not a case of vexatious, unwarranted litigation as the father's claims of parental alienation suggest. Instead, this is a case where a mother, in good faith, sought assistance from the appropriate professionals and court upon the alleged disclosure of sexual

IV.

DISPOSITION

The order of the trial court is affirmed.  P.M. is entitled to costs on appeal.[14]

AARON, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

---

assault by her child."  Amici argue that the "discretionary fee statute exists to address unwarranted filings."  However, amici presuppose an underlying factual scenario that the trial court expressly rejected, i.e., that S.S. justifiably sought the court's assistance to protect her child from suspected abuse, and that her filing was therefore warranted.  The trial court rejected S.S.'s contentions and found instead that her claims of abuse, both sexual abuse regarding N. and other abuse directed toward S.S., were not credible.  Again, it is not our role to second-guess the trial court's credibility and factual findings.

[14]    At oral argument, P.M. requested that this court impose sanctions on S.S. to compensate him for the time he has spent working on this case.  Because such a request does not comply with the Rules of Court, we decline to consider it.  (See Cal. Rules of Court, rule 8.276(b) [a request for appellate sanctions requires a separate motion with a supporting declaration]; see also *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 807 [declining to consider request for sanctions raised in party's brief].)